### 38922. WILLIAMS v. THE STATE.

HILL, Chief Justice.

Harold Glenn Williams was convicted of burglary and murder and received twenty years for the burglary and the death penalty for the murder. His trial was conducted under the Unified Appeal procedures set out at 246 Ga. A-1 (1980), as amended, 248 Ga. 906 (1982).

The defendant is the grandson of Archie Lane, the 72-year-old victim in this case. The elderly victim did odd jobs to supplement his social security income. The evidence showed that, up to about nine months before the murder, the defendant and his grandfather had shared a father-son relationship and that the defendant had often lived for extended periods with his grandparents. The defendant's grandmother died about 18 months before his grandfather was killed. The state's theory of the case was that the disagreement that led to the victim's death stemmed from the $3000 insurance proceeds of a policy the victim had on his wife's life. By the defendant's own statement to an uncle, the defendant had demanded that the victim

pay the money over to a Mrs. Rinehart, and the victim had refused.

In October, 1979, the defendant approached the victim while he was lying in bed to try to force him to pay over the money. Q. Z. Lane testified that the defendant told him that when he tried to force the victim into paying the money to Mrs. Rinehart, he was confronted by the victim with a shotgun. He pushed the gun up and it went off into the ceiling of the house. The next day the victim, accompanied by his daughter, the defendant's mother, went to a justice of the peace for a peace warrant against the defendant. The defendant and the victim never spoke to each other again according to the witnesses' testimony.

Evidence was introduced, however, that the defendant asked his uncle, Charlie Glenn Williams, to deliver a note to the victim and that Charlie Williams in turn gave the note to the victim's brother, Arvell Lane. Arvell gave the note to the victim and saw the note and heard it read aloud twice. It stated: "Hi, old man. We know how much mamma's life was worth. But how much is your life to you. Its not worth anything. But if you want to keep it! tell Charles yes or no. If yes 3000.00 and I'll tell you where to send it. If no kiss your ass good-by!" This note was found by the victim's family in the victim's car the day after his death.[1]

Adell Bishop testified that about a month or two before the victim's death, he was at Q. Z. Lane's store in Sterling at the same time as the victim when they saw the defendant drive by. The victim left. About 45 minutes later, the defendant came into the store and asked Adell if the victim had left. Adell responded affirmatively; then a few minutes later, the defendant muttered, seemingly to himself: "You reckon grand-daddy's life was worth $3000?"

Q. Z. Lane testified that he saw the victim and the defendant at his store three or four times after the "squabble" and that neither one spoke to the other. Before that they had gotten along as father and son.

On June 22, 1980, at 10:35 p.m., the Gardi volunteer fire department was called to the victim's house to put out a fire. Upon entering the house thereafter, the body of the 110 pound, 5'5" victim was discovered lying in the doorway from the kitchen to the living room. The medical examiner testified that the victim had been beaten over the head at least 10 times with a blunt instrument.

---

[1] The note, when found by the family, had written on it at the bottom in blue ink, the statement: "Grand Son wrote this note & left in Mr. Lane's house." This inscription was not originally on the note, according to those who had seen it at the time it was delivered, and no one could explain who had written it.

Though his arm and face were blackened with soot, his body had not burned, but his blood was over 50% saturated with carbon monoxide. This led the medical examiner to conclude that the victim had been alive after the beating and had died from a combination of the skull injuries and smoke inhalation.

An investigation of the scene of the crime revealed that the house had been entered by breaking in through the screen porch and then by prying open the back kitchen door with a screwdriver. The detective also found a note in a box by the front door saying: "Two weeks, Love, Glenn." The detective testified that he had been at the victim's house about 2 weeks earlier in answer to a call by the victim that his home had been burglarized. At that time, the intruder had also entered the victim's porch by splitting the screen and opening the screen porch door, but had entered the house by breaking a window on the porch. Nothing was missing from the defendant's home.

The victim's girl friend, Gladys Beasley, testified that she and the victim had spent the day of June 22 together going to church and visiting her family, and that the victim had left her home at about 9:30 p.m. to return home and had with him a box of leftover chicken. A box and chicken bones were found scattered around the victim where he lay on the floor. The walls around him were splattered with blood. The state thus theorized that the defendant, and possibly another man, had entered the victim's home and had lain in wait for the victim to return; that when the victim entered the house he was beaten; the curtains were set on fire, and the two men left as they had come, by motorcycle.

Motorcycle tracks were found behind the house leading through a firebreak to the yard of a church located behind the victim's home in Gardi. A witness, looking out when she heard the fire alarm, saw two men go through a stop sign on a motorcycle headed for Jesup. Deanna Glass Williams, the then wife of Dennis Williams, testified that her husband owned two motorcycles and that on the evening of the murder, the defendant and her husband had come to their trailer in Jesup. She said that the defendant was covered with blood while her husband was not. Her husband told her they had been at a party where there had been a fight over drugs, and that someone had been shot, covering the defendant with blood. They put his clothes in the washing machine. She also said that the defendant told Dennis that if Dennis had not pulled the victim off the defendant, the victim would have killed the defendant: ". . . him and his grandfather were fighting and the way I understood it, his grandfather started getting the best of him, and Dennis intervened. And they had a time killing him." After Dennis left, the witness testified that the defendant went

berserk and kept talking about killing his grandfather and how hard it was to kill him.

She also said that her husband's family then flocked in to get rid of the evidence and had thrown his boots, filled with rocks, and a gun into the river, that she was afraid of her husband and his family, and that he wanted to go to Texas to hide but could not get the money. (Dennis Williams was later arrested in Florida and pleaded guilty to voluntary manslaughter, for which he received a 10-year sentence. He did not testify at the defendant's trial.)

Two statements made by the defendant were also admitted into evidence at the trial. In the first, made the day after the murder, the defendant admitted going to the victim's house and breaking in. He said he received the three scratches on his arm when he reached through the screen door to unlatch the porch door.[2] He said, however, that he then left the house without seeing the victim. At this point, the detective looked down at the defendant's boots, and asked the defendant about the stains he noted there. The defendant then requested to see his lawyer.[3]

The boots were removed from the defendant and the stains were tested and found to be human type A blood with an enzyme PGM factor type 1. The victim's blood was also tested and was type A, PGM-1, a combination shared by 24% of the population.

On November 12, 1980, Detective Shuman again had the opportunity to interview the defendant when he and the retained attorney who then represented the defendant arranged a meeting in the polygraph room at the GBI office in Savannah.[4] The defendant not only was given the Miranda (v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966)) warnings, but also was clearly told by his own attorney that no promises had been made for his statement and that he was free not to say anything. The attorney did advise him to make the statement as part of a well-calculated risk that Detective Shuman might then enter into a plea agreement. (The defendant later

---

[2] Detective Shuman photographed these scratches and the photos were in evidence at the trial. Additionally, the defendant was examined by a doctor and the doctor testified that the defendant, on the afternoon after the victim died, had bruises with some swelling and abrasions between his thumb and index finger and bruises and scratches on his left thigh, which appeared to be from 12 to 24 hours old.

[3] Regarding the officer's testimony that the defendant requested to see his lawyer, see Durden v. State, 250 Ga. 325 (3, 4) (297 SE2d 237) (1982). In view of defendant's incriminating admission over three months later, we find the officer's reference to defendant's request for counsel to be harmless beyond a reasonable doubt.

[4] No objection was made to this mention of the polygraph room, and we find no harmful or prejudicial effect.

withdrew his plea of guilty and an attorney was appointed to represent him at his trial.)

In his statement, the defendant said that he and another man had gone to Gardi on a red motorcycle a man had offered to him at a greatly reduced price. They had stopped at the store next to the victim's house; then, because he and the victim had an ongoing drug deal whereby the defendant picked up money and drugs at the victim's home, they broke into the porch when they found it locked, and into the house, to see if drugs or money had been left out for a pickup. He further stated that while the other man was plundering around the house, they heard someone come in and the defendant hid in the bathroom. When it turned out to be only the victim with a chicken box in his hand, the defendant spoke up, but the victim went for his pistol. They started to fight, and the defendant knocked the victim down, but never hit, beat or kicked him anymore after that. According to the defendant, the other man, Dennis Williams, then came running in from the other room and beat the victim in the head with a tire tool. After the defendant stopped Dennis from beating the victim, they wrapped the tire tool and the pistol in a fuzzy blue commode cover. According to the defendant's statement, Dennis Williams set the house on fire, and after the defendant tried to help his grandfather, they returned to Jesup on the motorcycle by another route. Dennis Williams got rid of the motorcycle.[5]

After the state rested, the defense also rested without presenting any evidence during the guilt phase of the trial. After the trial court's charge, the jury convicted the defendant on both the burglary and murder counts.

During the sentencing phase, the state presented no additional evidence. The defendant called three ministers to testify to his good character. Then his mother, who was also the daughter of the victim, appeared on behalf of her son. She stated that she and the victim were very close and that she had accompanied her father to obtain the peace warrant against her son. She explained that the victim told her that the defendant had walked in and hit him, while he was lying in his bed, and that he would have killed the defendant, but had tripped in the bedspread while getting his shotgun and it had gone off into the ceiling.

She also testified that her husband died when the defendant was

---

[5] The motorcycle was never found, and no identifiable fingerprints were discovered in the house or on an empty lighter fluid can found in the bedroom where the fire started.

twelve years old and her younger child was two months old; that the victim and his wife had moved in with her to keep the children and the house while she worked; that the defendant was upset by the death of his grandmother, whom he felt was not given proper medical care, and that this was the source of the defendant's problem with the victim.

The defendant's mother also exhibited the honorable discharge the defendant earned as a United States Marine in October, 1978, and Good Conduct and Presidential Fitness awards, as well as a President's Award for service in the White House and at Camp David where he had guarded the President.

After argument and charge the jury imposed the death penalty for the murder, finding that the murder was committed while the defendant was engaged in the commission of a burglary, OCGA § 17-10-30 (b) (2) (Code Ann. § 27-2534.1), and was "outrageously and wantonly vile, horrible and inhuman in that it involved torture and depravity of mind, or an aggravated battery to the victim, Archie Lane." See OCGA § 17-10-30 (b) (7) (Code Ann. § 27-2534.1). The jury did not find the additional aggravating circumstance charged that the murder was committed while the defendant was engaged in the commission of arson, OCGA § 17-10-30 (b) (2) (Code Ann. § 27-2534.1). The defendant was sentenced accordingly, and after the denial of his motion for new trial, this appeal followed.

1. In his first and second enumerations of error, the defendant argues that the trial court erred in holding that his November 12, 1980, statement was made without hope of reward, and in admitting it into evidence. He relies on the testimony during the Jackson-Denno hearing by the retained attorney who represented him at the time who said: " 'Let me get a couple of things clear. There are no promises here; there are no inducements; there are no hopes of reward or benefit or anything else.' Because of an understanding that I had over a long period of time derived to [the defendant] about what we would attempt to do in his defense in this case, I advised him that he should not expect anything whatsoever from the making of this statement. And I advised him if he didn't want to, we'd all get back in the car and we'd go home." After stating that the defendant made the statement freely and voluntarily, he continued: "The only thing that I think I ought to add in all candor is that, in advising [the defendant] to make the statement and mentioned again to Mr. Shuman, I did reiterate in Mr. Shuman's presence that it was my understanding that Mr. Williams would make a statement, that it was my opinion that if he did render that statement, that it would be in Mr. Shuman's election and the election of the District Attorney to enter into a plea agreement which I hoped to consummate, that might be of benefit to

[the defendant], but I did, however, make very clear in specific language that Mr. Shuman was not part of this agreement, not part of this understanding, but this was our calculation, not any part of anything he had said or indicated or promised or intimated."

In answer to the question ". . . was there anything at that time which would in any way lead [the defendant] to believe that this statement would lead to a plea agreement?", the attorney stated: "Well, I feel that that is probably what he honestly felt, . . . and the nuance I'm trying to draw here is — exclusively on my discussions with him, which were not in any way intimated to him or from me as being tied in with any discussions whatsoever with the District Attorney or the police." He also told the defendant: " '. . . Mr. Shuman has no idea what your statement is and he has no idea what your statement is going to be. If there's going to be any discussion in this room about any expectation or understanding as to what's any benefit or hope of reward from this, don't make it. Mr. Shuman owes you nothing. You either make this statement, blank, no promises, no expectations, or you don't."

The defendant contends that the statements of the attorney were equivocal in that the attorney's advice to him was that if he made the statement, the state might negotiate a plea and that advice coupled with the silence of the detective on this point created an inducement by them for him to give the statement with slight hope of reward contrary to OCGA § 24-3-50 (Code Ann. § 38-411).[6]

The defendant analogizes this situation to that in *Askea v. State,* 153 Ga. App. 849, 851 (267 SE2d 279) (1980), where the Court of Appeals held that a statement by a police officer that telling the truth "would probably help him in court" constituted hope of reward and rendered the resulting statement involuntary.[7] We do not agree.

The colloquy quoted extensively above makes clear that the defendant understood the conditions under which his statement was being made. In *Dickey v. State,* 157 Ga. App. 13, 14 (276 SE2d 75) (1981), it was held that, where the hope or fear is a product of the defendant's own mind, rather than the result of inducement by others, the statement is admissible. OCGA § 24-3-50 (Code Ann. § 38-411), supra. See also *Gates v. State,* 244 Ga. 587, 590-591 (261

---

[6] "To make a confession admissible, it must have been made voluntarily without being induced by another, by the slightest hope of benefit or remotest fear of injury." OCGA § 24-3-50 (Code Ann. § 38-411).

[7] The statement's admission was held to be harmless error, however, since the defendant made a similar statement while testifying at trial. Compare *Robinson v. State,* 229 Ga. 14 (1) (189 SE2d 53) (1972) (mere admonitions to tell the truth do not render the statement inadmissible).

SE2d 349) (1979). Enumerations of error 1 and 2 are without merit.

In enumeration 5, the defendant contends that the trial court erred in allowing Detective Shuman to state that he had furnished a copy of the defendant's November 12, 1980, statement to defendant's trial counsel. He urges that this declaration was irrelevant and prejudicial because it implied that the defense attorney representing him at trial was a part of the earlier statement. It was clear during the trial that the defendant had been represented by a different attorney when he made the November 12, 1980, statement, and we find no error here.

2. The third enumeration of error questions the admissibility of the peace warrant taken out 9 months earlier by the victim against the defendant. At a pretrial motion in limine, the trial court held that the peace warrant would be admissible at trial provided "evidence of the facts surrounding the peace warrant . . . [were] presented prior to any evidence concerning the peace warrant itself."

The evidence at trial showed that the victim and defendant had been involved in a squabble 8 or 9 months prior to the victim's death and that the peace warrant was issued by the justice of the peace because the victim stated he was afraid of the defendant. Although this officer could remember no details surrounding its issuance, he stated that he always considered the evidence adduced before issuing such warrants. However, Q. Z. Lane testified that the defendant told him that the victim sought the peace warrant after a shooting incident related to an effort by the defendant to force the victim to pay the insurance proceeds to Mrs. Rinehart.

Arvell Lane testified that he knew there had been a "squabble" between the victim and the defendant about 8 or 9 months before the killing and that at that time the victim had called the sheriff from Arvell's house and then Arvell had driven the victim to the sheriff's office to obtain a peace warrant. He also stated that the threatening note was delivered to his house about a month or two after the warrant incident, and that he never saw the two of them together again after that. Adell Bishop testified that the defendant made the statement: "You reckon grand-daddy's life was worth $3,000?" about a month or two before the victim's death, while Q. Z. Lane testified that, although he had seen the victim and the defendant together three or four times at his store after their "trouble," they never again had spoken to each other. And, then there is the somewhat ambiguous, but relevant second note found in the message box on the front of the victim's house: "Two weeks. Love, Glenn."

As we stated in *Gunter v. State,* 243 Ga. 651, 656 (256 SE2d 341) (1979), and reiterated most recently in *Nicholson v. State,* 249 Ga. 775, 777 (294 SE2d 485) (1982): " 'In a murder prosecution, evidence

of prior quarrels and difficulties between the defendant and the victim, which persist until the time of the killing, thereby shedding light upon the motive of the killing and explaining conduct, is admissible.' " The issuance of the peace warrant was only one incident, albeit the initial one, in a series by which the state sought to prove the defendant's motive in killing the victim.

We find that the evidence about the peace warrant was an element of the circumstances showing difficulties which persisted until the time of the killing and thus was admissible under OCGA § 24-2-2 (Code Ann. § 38-202). The length of time between the issuance of the peace warrant and the murder, about nine months, does not render the warrant inadmissible. See 2 Wharton's Crim. Ev. (10th Ed.) § 918, quoted in *Milton v. State,* 245 Ga. 20, 23 (262 SE2d 789) (1980); see also *Nicholson v. State,* supra, 249 Ga. 775 (2). We find no error in the admission of the peace warrant into evidence by the trial court. *Hales v. State,* 250 Ga. 112 (296 SE2d 577) (1982).

By the same reasoning, the trial court properly charged the jury on recent prior difficulties and enumeration of error 8 likewise has no merit.

3. Enumeration 4 raises the propriety of admitting seven photographs, both color and black and white, of the victim at the crime scene, and one during the autopsy. The defendant asserts correctly that four of the photographs were repetitious of others and should have been excluded upon objection. He vehemently argues that the photograph of the victim's nude body taken at the autopsy, showing the victim's genitalia, was irrelevant and was calculated to inflame the minds of the jury. While we agree that the duplicative photos and the autopsy photo should not have been admitted, see *Ramey v. State,* 250 Ga. 455 (1) (298 SE2d 503) (1983); *Florence v. State,* 243 Ga. 738, 741 n. 1 (256 SE2d 467) (1979), it cannot be said that their admission constitutes reversible error in light of defendant's two incriminating admissions and the other evidence. *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976).

4. A challenge to the sufficiency of the evidence under the indictment for burglary constitutes the defendant's sixth enumeration of error. In count one, the defendant was indicted for and convicted of "the offense of Burglary for that the said Harold Glenn Williams . . . did . . . without authority and *with the intent to commit a felony therein, to-wit: Aggravated Assault,* enter a dwelling house occupied by Archie S. Lane. . . ."[8] (Emphasis supplied.) On

---

[8] OCGA § 16-7-1 (a) (Code Ann. § 26-1601) provides: "A person commits burglary when, without authority and *with the intent to commit a felony* or theft therein, he enters or remains within the dwelling house of another. . . ."

appeal, he claims there is no evidence to support the view that he entered the building with the intent to commit aggravated assault. He urges that neither of his incriminating statements showed an intent to commit aggravated assault. As can be seen from the statement of facts, however, viewing the evidence in the light most favorable to the verdict, it was sufficient beyond a reasonable doubt for a rational trier of fact to find the defendant entered the victim's home with intent to commit aggravated assault. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). See *Ealey v. State,* 139 Ga. App. 604, 606 (229 SE2d 86) (1976). The trial court did not err in refusing to grant a directed verdict on this count.

Similarly, in enumeration 7, the defendant urges error in the refusal of the trial court to direct a verdict of acquittal as to murder. It appears that the argument here is that the burglary (entering with the intent to commit the felony of aggravated assault) and murder are inconsistent. However, "[a] person commits aggravated assault when he assaults (1) with intent to murder, to rape, or to rob, or (2) with a deadly weapon. . . ." OCGA § 16-5-21 (a) (Code Ann. § 26-1302). Thus, the two charges are not legally incompatible. See *Oglesby v. State,* 243 Ga. 690 (3) (256 SE2d 371) (1979). Nor is one a lesser included offense of the other.[9] OCGA §§ 16-1-6 (Code Ann. § 26-505), 16-1-7 (Code Ann. § 26-506). The jury was authorized to find the defendant guilty of murder, Jackson v. Virginia, supra, and the trial court did not err in overruling his motion for a directed verdict on the murder charge.

Enumerations of error 6 and 7 raise no grounds for reversal.

### Sentence Review

5. Enumeration of error 9 alleges prejudicial error in the closing argument of the district attorney in the sentencing phase of the trial. During the evidentiary portion of the sentencing phase, the defendant's mother presented evidence relating to the defendant's military record as a member of the United States Marine Corps. In his closing argument, the district attorney said: "You've got every right to conclude that the one thing they do teach you in the Marine Corps is how to kill. . . ." And later, ". . . is that not the act of a trained U. S. Marine, a man who was trained to kill, a man who was trained to

---

[9] The defendant errs in focusing only on the aggravated assault rather than the crime of burglary for which the defendant was indicted and convicted. Under the facts of this case, aggravated assault and murder convictions might merge. However, the same is not true of burglary and murder since proof of additional elements must necessarily be shown to establish each crime. See *Oglesby v. State,* supra, 243 Ga. at 691 (2).

the point that you can even conclude that he enjoyed the killing?"

Although we express no approval of this argument, we do not find, as urged by the defendant, that it so appealed to "current anti-patriotic and anti-military sentiments" that the defendant was prejudiced thereby, and find no reversible error. *Martin v. State*, 223 Ga. 649 (2) (157 SE2d 458) (1967). The district attorney's argument is an obvious overstatement and its factual incorrectness is readily apparent to anyone. Thus, we do not find that it appealed to the passions and prejudice of the jury so as to render the defendant's trial fundamentally unfair. Compare Hance v. Zant, 696 F2d 940 (11th Cir. 1983).

6. In his tenth enumeration of error, the defendant contends that the trial court erred in failing to charge the jury that in order for the death penalty to be imposed the state must show that the defendant "actually killed the deceased or intended or contemplated that the deceased's life would be taken." He relies upon the recent decision in Enmund v. Florida, —— U. S.—— (102 SC 3368, 73 LE2d 1140) (1982).

Under the facts of this case we find Enmund v. Florida, supra, to be inapplicable. There, Enmund, the driver of the getaway car in the armed robbery of a residence, was convicted of felony murder and given a death sentence although he was not present at the place where the double killings occurred and no evidence was presented showing the killings were ordered by him or were part of the conspiracy. Accordingly, the United States Supreme Court reversed the death sentence, not because of an error in the charge of the court but because the Supreme Court found that imposition of the death penalty upon Enmund was unconstitutional.

Here, the undisputed evidence showed that the defendant entered the victim's house and, by his own admission, the defendant hit the victim over the head at least once. The jury was charged on the law relating to parties to a crime and that mere presence is insufficient, that intent is a specific element of both of the crimes with which he was charged that must be proved beyond a reasonable doubt, and also that to find the defendant guilty of burglary, the jurors must find that the defendant intended to kill as an essential element of the aggravated assault upon the victim.[10] Thus, the jury's guilty verdicts for malice murder and burglary (with intent to commit aggravated assault) reflect a finding by the jury that the defendant intended and participated in the murder, and it is clear that the jury found that the defendant "killed or attempted to kill" and "intended

---

[10] See OCGA § 16-5-21 (a) (Code Ann. § 26-1302) and Division 4, supra.

or contemplated that life would be taken," as required to assess the death penalty under Enmund v. Florida, supra. There is no error here.

7. In enumeration of error 11, the defendant again argues that there is no evidence in the record that he entered the victim's home intending to commit aggravated assault, and therefore, that one of the aggravating circumstances found, that the murder was committed during the commission of burglary, is not supported by sufficient evidence and thus was not proved beyond a reasonable doubt. For the reasons given in Division 4, this argument has no merit.

Likewise, the evidence supports the jury's conclusion that the "offense of murder was outrageously and wantonly vile, horrible and inhuman in that it involved torture, and depravity of mind, or an aggravated battery to the victim. . . ." This 110 pound, 72-year-old victim was beaten over the head with a blunt instrument at least 10 times, crushing his skull and spattering his blood over the walls and the clothes and boots of his assailant. Still alive, he was left bleeding on the floor, as the house was set on fire, scorching his arms and head. He died of the bleeding caused by these injuries along with carbon monoxide poisoning from inhaling the smoke from the fire. Compare *Gilreath v. State,* 247 Ga. 814 (19) (279 SE2d 650) (1981).

The defendant argues, however, that because this aggravating circumstance is styled in the disjunctive it is impossible to know what determination the jury made — i.e., whether it found torture, depravity of mind or aggravated battery.[11] He urges that the evidence does not support findings of torture or aggravated battery and that the jury could not know how to determine depravity of mind. The trial court had defined aggravated battery. See *Gilreath v. State,* supra, 247 Ga. at 836. As can be seen, the evidence is sufficient to allow a rational trier of fact to find torture[12] or aggravated battery[13] as

---

[11] Defendant points out that the jury was charged incorrectly in the following language: "In that it involved torture and depravity of mind, or an aggravated battery." The "and" does not appear in OCGA § 17-10-30 (b) (7) (Code Ann. § 27-2534.1). However, we find no harmful error. The charge as given presented a higher test by requiring findings of both torture and depravity of mind rather than either one of them alone, which is all that is necessary under the statute as written. Thus, the misquotation benefited the defendant.

[12] "Torture occurs when the victim is subjected to serious physical abuse before death." *Hance v. State,* supra, 245 Ga. at 861.

[13] "An aggravated battery occurs when '[a] person . . . maliciously causes bodily harm to another by depriving him of a member of his body, or by rendering a member of his body useless, or by seriously disfiguring his body or a member thereof.' [OCGA § 16-5-24 (a) (Code Ann. § 26-1305)]." *Hance v. State,* supra, 245 Ga. at 861.

well as depravity of mind.[14] *Hance v. State,* 245 Ga. 856 (3) (268 SE2d 339) (1980).[15]

8. After review of the record in this case, including those matters dealt with in Divisions 3 and 5 of this opinion, we conclude that the sentence of death was not imposed under the influence of passion, prejudice, or other arbitrary factor. OCGA § 17-10-35 (c) (1) (Code Ann. § 27-2537).

9. We find that the sentence of death imposed in this case is not excessive or disproportionate to sentences imposed in similar cases. Our cases show that juries find the death penalty to be appropriate punishment where an adult defendant commits murder during an unlawful intrusion into a private home. See, e.g., *Horton v. State,* 249 Ga. 871 (14) (295 SE2d 281) (1982), and cases cited in the appendix. Moreover, the brutality displayed by the defendant in this case, and the extremely offensive manner by which he committed the murder (see appendix), additionally distinguish this murder from those murders for which the death penalty is not appropriate. Compare *Phillips v. State,* 250 Ga. 336 (297 SE2d 217) (1982). The similar cases listed in the appendix support the death penalty in this case.

*Judgment and sentence affirmed. All the Justices concur.*

DECIDED FEBRUARY 16, 1983.

*Gibbs, Leaphart & Smith, Robert B. Smith,* for appellant.

*W. Glenn Thomas, Jr., District Attorney, Jerry W. Caldwell, Assistant District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.

APPENDIX.

*Horton v. State,* 249 Ga. 871 (295 SE2d 281) (1982); *Berryhill v. State,* 249 Ga. 442 (291 SE2d 685) (1982); *Cunningham v. State,* 248 Ga. 558 (284 SE2d 390) (1981); *Gilreath v. State,* 247 Ga. 814 (279

---

[14] "[A] defendant who tortures the victim or subjects the victim to an aggravated battery before killing the victim can be found to have a depraved mind.

"In determining whether the evidence shows 'depravity of mind,' the age, and the physical characteristics of the victim may be considered. See *Thomas v. State,* 245 Ga. 688 (1980)." *Hance v. State,* supra, 245 Ga. at 862.

[15] Defendant's final enumeration of error raises the refusal of the trial court to grant the defendant's motion for new trial on grounds reiterated on appeal. Since we have found no reversible error under those enumerations of error, we also find that the trial court did not err in failing to grant the defendant's motion for new trial.

We have reviewed the record pursuant to the Unified Appeal Procedure and find no addressable error not enumerated by defendant.

SE2d 650) (1981); *Cape v. State,* 246 Ga. 520 (272 SE2d 487) (1980); *Hamilton v. State,* 246 Ga. 264 (271 SE2d 173) (1980); *Bowden v. State,* 239 Ga. 821 (238 SE2d 905) (1977); *Hill v. State,* 237 Ga. 794 (229 SE2d 737) (1976); *Moore v. State,* 233 Ga. 861 (213 SE2d 829) (1975).