Harold Glenn WILLIAMS,
Petitioner–Appellant,

v.

Ralph KEMP, Warden, Georgia
Diagnostic and Classification
Center, Respondent–Appellee.

No. 87–8698.

United States Court of Appeals,
Eleventh Circuit.

May 17, 1988.

Steven Kiersch, Kiersch & Buckman, Nicholas Karabelas, Harmon & Wilmot, Washington, D.C., for petitioner-appellant.

Paula K. Smith, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before KRAVITCH, JOHNSON and EDMONDSON, Circuit Judges.

EDMONDSON, Circuit Judge:

Harold Glenn Williams, a Georgia prisoner under a sentence of death, appeals from a decision of the United States District Court for the Southern District of Georgia denying his petition for a writ of habeas corpus. For the following reasons, we affirm.

Williams was convicted and sentenced to death for the murder of his grandfather, Archie Lane.[1] At trial, the prosecution submitted evidence of the estranged relationship between Williams and his grandfather. The two had enjoyed a close relationship until about nine months before the murder, when a dispute arose involving the proceeds of a life insurance policy of Lane's late wife (Williams' grandmother) who had recently died. Evidence indicated that during this nine month period Williams had made various threats against the victim.

On the day of the murder, Lane's body was discovered by firemen summoned to the victim's house to put out a fire. The walls near the victim's body were splattered with blood. An investigation of the crime scene indicated that the rear screen porch of Lane's house was broken though and the back door forced open, but nothing of Lane's was determined to have been stolen. At trial, the medical examiner testified that Lane had been beaten over the head with a blunt object and had died from a combination of skull injuries and smoke inhalation.

Almost immediately, suspicion focused upon Williams because of the verbal and written threats he previously had made on his grandfather's life. During the trial, to demonstrate the hostility between Williams and Lane, the prosecution produced evidence of a peace warrant[2] that Lane had taken out against Williams nine months before the murder when Williams tried to force Lane to pay over the disputed insurance money. Also produced was a handwritten letter that Williams sent to Lane stating,

Hi, old man. We know how much momma's life was worth. But how much is your life to you. Its not worth anything. But if you want to keep it tell Charles yes or no. If yes $3000.00 and I'll tell you where to send it. If no kiss your ass goodby!

In addition, two weeks before his death, Lane reported that his house had been burglarized. Also, a note discovered at Lane's house the day after the murder reading: "Two weeks. Love, Glenn," was entered into evidence.

Two statements made by Williams to the police were also admitted into evidence. In the first statement, which he made the day following the murder and after his having been arrested and advised of his constitutional rights, Williams admitted burglarizing Lane's house, but denied ever seeing the victim. During this interview, the police noticed some reddish-brown stains on the boots Williams was wearing and asked Williams to remove his boots. When in-

---

1. Williams was also convicted of the burglary of the victim's home pursuant to O.C.G.A. sec. 16-7-1(a) (1982) for which he received a 20 year sentence.

2. A peace warrant, also referred to as a peace bond, is typically issued by a judicial officer upon a sworn statement by a person that he fears bodily harm from a third party. The warrant requires the posting bond which will be forfeited should the third party fail to keep the peace. See O.C.G.A. sec. 17-6-110 (1982).

formed that the stains looked like blood, Williams requested an attorney and terminated the interview.[3]

Testimony was also admitted about Williams' second statement made during a subsequent interview which had been arranged at Williams' request. According to this statement, Williams and his half-brother, Dennis, broke into the victim's house and waited until Lane returned. When Lane returned and brandished a pistol, a struggle ensued between Lane and Williams during which Williams claimed only to have knocked Lane down. Williams further stated that Dennis then appeared and repeatedly beat Lane about the head with a tire iron. Williams then claimed that while he tried to help his grandfather, Dennis set the victim's house on fire.

Before this later interview Williams was again advised of his constitutional rights and told by his attorney that no promises had been made for his statement and that he was free to say nothing. His attorney did advise Williams to give the statement in hopes of entering a plea agreement at a later date.[4]

In sharp contrast to Williams' statements, the prosecution produced the testimony of Deanna Glass, the ex-wife of Dennis. She testified that Williams and her ex-husband had visited her the night of the murder and that Williams' clothes were covered with blood, while Dennis' were not. Glass also testified that Williams had boasted about how difficult it was to kill Lane.

After the prosecution concluded, the defense produced no evidence. Instead, the defense relied upon the argument that the prosecution had failed to prove Williams'

guilt beyond a reasonable doubt. The jury, however, found Williams guilty of murder [5] and burglary. During the sentencing hearing, the prosecution relied on the evidence adduced during the guilt phase. Williams refused to testify on his own behalf and instructed his attorney Robert Smith not to present any mitigating evidence. Notwithstanding Williams' objections, Smith presented the testimony of three ministers who testified concerning Williams' good character. Also, Williams' mother—the daughter of the victim—testified, among other things, about her son's distinguished career in the United States Marine Corps in which he was assigned to the White House and Camp David to guard the President.

In connection to testimony about Williams' military service, the prosecutor, during closing argument in the sentencing hearing, stated:

> [Y]ou've got every right to conclude that one thing they do teach you in the Marine Corps is how to kill.... [And] is that not the act of a trained United States Marine, a man who was trained to kill, a man who was trained to the point that you can even conclude that he enjoyed killing.

Williams was sentenced to die for the murder of his grandfather.

Williams' convictions and sentences were affirmed on direct appeal in *Williams v. State*, 250 Ga. 553, 300 S.E.2d 301 (1983). He then filed a state habeas petition, alleging among other things that the trial court's instructions to the jury on malice and on the presumption of intended consequences were unconstitutionally burden-shifting under *Sandstrom v. Montana*, 442

---

**3.** These stains were tested and found to be human type A blood with an enzyme PGM factor type 1. The victim's blood was also tested and was found to be type A, PGM–1, a combination shared by 24% of the population. Williams claims this is his blood type as well.

**4.** Prior to trial and upon his attorney's advice, Williams entered a plea of guilty to charges of manslaughter and burglary and agreed to testify against Dennis in exchange for a recommendation that he would receive a sentence of thirty years imprisonment. Upon learning that Dennis had subsequently been arrested and had

entered a similar plea arrangement for a lesser term of imprisonment, Williams withdrew his plea against his attorney's advice. Thereafter, this attorney withdrew from the case; and Robert Smith was appointed to represent Williams.

**5.** The Georgia Code contains only one degree of murder. A person commits murder "when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." O.C.G.A. sec. 16–5–1(a). A person convicted of murder "shall be punished by death or by imprisonment for life." *Id.* at sec. 16–5–1(b).

U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). This state petition was denied at trial and on appeal; the United States Supreme Court, however, remanded his petition to the Georgia Supreme Court for reconsideration in light of *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed. 2d 344 (1985). *Williams v. Kemp*, 474 U.S. 806, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985). Upon reconsideration, the Georgia Supreme Court again denied Williams' request for habeas relief. *Williams v. Kemp*, 255 Ga. 380, 338 S.E.2d 669, *cert. denied*, —— U.S. ——, 106 S.Ct. 3341, 92 L.Ed.2d 744 (1986). Williams then filed for federal habeas relief.

Williams contends that the district court erred when it denied his petition for habeas corpus. Specifically, Williams raises ten claims: (1) that he was denied effective assistance of counsel; (2) that the admission of a peace warrant into evidence rendered his trial fundamentally unfair; (3) that the admission of certain photographs rendered his trial fundamentally unfair; (4) that involuntary statements were admitted against him; (5) that the prosecutor's closing argument rendered his sentence fundamentally unfair; (6) that the *Sandstrom* error committed by the trial court was not harmless; (7) that the sentencing jury was not properly instructed regarding the consideration of mitigating circumstances; (8) that his death sentence was arbitrarily imposed; (9) that his death sentence was discriminatorily imposed; and (10) that the death penalty is unconstitutional.

Williams contends that his attorney, Robert Smith, was ineffective during both the guilt and sentencing phases of the trial.[6] First, he argues that Attorney Smith failed to hire expert witnesses. Second, Williams states that Smith failed to conduct an adequate investigation during his trial and sentencing hearing.

Preliminarily, we note that Attorney Smith has considerable experience and expertise in handling criminal matters. In the years preceding his representation of

Williams, Smith tried at least six murder cases, one of which involved the death penalty. Thus, it is apparent that Smith was a well-respected lawyer, thoroughly familiar with practice and with sentencing juries in the local community. In fact, the record indicates that one reason Williams had requested Smith was that he had recently obtained an acquittal in another murder case.

■ The proper standard for evaluating Smith's representation is "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Generally, "counsel is presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. Accordingly, judicial scrutiny of an attorney's performance is highly deferential, and appellate courts must not attempt to second guess strategic decisions. *Id.* at 689, 104 S.Ct. at 2065. Instead, we must evaluate the reasonableness of Smith's conduct in light of the then existing circumstances. *Id.* Thus, to prevail in his ineffective assistance claim, Williams must show: (1) that Smith's representation was outside the wide range of reasonable professional conduct, *and* (2) that Smith's deficient representation prejudiced the defense. *Id.* at 687–91, 104 S.Ct. at 2065–66.

Regarding Williams' first ground for his *Strickland* claim, he contends that Smith should have hired expert witnesses to challenge the prosecution's witnesses' testimony about the blood stains on Williams' boots and the handwriting of the threatening note that the victim received. This claim is inextricably intertwined with Williams' claim that Smith failed to investigate adequately various defenses during his trial. Therefore, we will evaluate both of these claims together.

■ We conclude that Smith's decision not to call a defense expert to challenge the

---

6. In his initial brief, Williams also alleges that his first attorney rendered ineffective assistance of counsel prior to trial by allowing Williams to give a statement which was later used to convict

him; in his reply brief Williams admits, however, that this claim is waived because it was not raised before the district court. *See Stephens v. Zant*, 716 F.2d 276, 277 (5th Cir.1983).

blood stain on Williams' boot was a deliberate tactical decision. As Smith stated during the state habeas proceeding, when faced with Williams' earlier statement to the police in which he admitted being present while Dennis killed the victim, "[o]ur whole strategy in the trial of the case centered around a defense of Mr. Williams' actions making it consistent with the statement that had been made." Indeed, in his earlier statement, Williams said that he had tried to help the victim after Dennis had beaten him. Thus, the fact that the blood on Williams' boots matched that of the victim was consistent with the defense's theory of the case; Smith's decision not to call expert witnesses concerning the blood stain on Williams' boots was reasonable. Moreover, any decision not to pursue alternative defense theories was similarly tactical in nature and entirely consistent with Williams' earlier statement.

■ We also reject Williams' claim that Smith should have hired a handwriting expert to show that he did not write the threatening note Lane received. The record reflects that Williams had told Smith that Williams wrote the note. In light of this admission by Williams, Smith's decision not to produce contrary testimony merely fulfilled his ethical obligation to refrain from producing false or misleading evidence. *Cf. Nix v. Whiteside,* 475 U.S. 157, 164–76, 106 S.Ct. 988, 993–99, 89 L.Ed. 2d 123 (1986) (an attorney does not render ineffective assistance of counsel by refusing to cooperate with defendant in presenting perjured testimony at trial). Consequently, Smith's failure to hire a handwriting expert did not constitute ineffective assistance of counsel.

■ We similarly reject Williams' claim that Smith inadequately investigated and presented mitigating evidence for his sentencing hearing. During his sentencing hearing, Williams objected to Smith's decision to present any mitigating evidence, and he refused to testify in his own behalf. These objections notwithstanding, Smith presented the testimony of three ministers who testified as to Williams' good character. Smith also produced the testimony of

his mother—the victim's daughter—who described, in sympathetic terms, Williams' background and the basis of the dispute between Williams and Lane; she also testified about Williams' career as a United States Marine. The record at the state habeas corpus hearing indicates that Smith spoke to everyone Williams brought to his attention. Although Williams later produced nine affidavits of others who stated that they would have gladly testified on Williams' behalf had they been asked, a review of the affidavits indicates that they contained statements by friends and relatives which were substantially similar to the evidence Smith presented at the hearing. Consequently, these affidavits alone are insufficient to rebut the "strong presumption that [Smith]'s conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 689, 104 S.Ct. at 2066.

■ Williams' second issue is that the admission of a peace warrant taken out by Lane against Williams nine months prior to the murder violated his due process rights. Not all state evidentiary errors will justify the grant of a writ of habeas corpus; there must be a denial of fundamental fairness. To constitute a denial of fundamental fairness, the evidence must have been not only erroneously admitted at trial, but also must be "material in the sense of a crucial, critical, highly significant factor" in the conviction. *Jameson v. Wainwright,* 719 F.2d 1125, 1126–27 (11th Cir.1983) (per curiam), *cert. denied,* 466 U.S. 975, 104 S.Ct. 2355, 80 L.Ed.2d 827 (1984).

We conclude that Williams was not deprived of fundamental fairness because the peace warrant evidence objected to was properly admitted. *See Amadeo v. Kemp,* 816 F.2d 1502, 1504–05 (11th Cir.) (where Georgia Supreme Court expressly ruled that evidence was, under state law, properly admitted, "we cannot say that its admission denied Amadeo fundamental fairness...."), *cert. granted,* —— U.S. ——, 108 S.Ct. 257, 98 L.Ed.2d 214 (1987). Under O.C.G.A. sec. 24–2–2 (1982 & Supp. 1987) evidence of "prior difficulties between the accused and the victim is admis-

sible to illustrate the accused's motive, intent, or bent of mind toward the victim"; therefore, the peace warrant was clearly relevant to show Williams' motive and "bent of mind" towards Lane. *See Hales v. State,* 250 Ga. 112, 113, 296 S.E.2d 577, 579 (1982). Accordingly, we conclude its admission into evidence did not violate Williams' due process rights.

■ Williams' third contention is that the admission of seven photographs of the victim's body violated his due process rights. Specifically, Williams contends that the photographs were cumulative and that one photograph of Lane's nude body taken at the autopsy showing his genitalia was irrelevant and inflamed the jury. The Georgia Supreme Court concluded "that four of these photographs were repetitious of others and should have been excluded upon objection ... [however,] it cannot be said that their admission constitutes reversible error in light of [William]'s two incriminating admissions and the other evidence." *Williams v. State,* 250 Ga. at 560–63, 300 S.E.2d at 307–08. We agree. As noted in our discussion of the peace warrant, evidentiary errors must deny a criminal defendant fundamental fairness in order to be cognizable in a habeas proceeding. Here we are unpersuaded that the challenged photographs were "a crucial, critical, highly significant factor" in the case against Williams so as to have denied him a fundamentally fair trial. *Osborne v. Wainwright,* 720 F.2d 1237, 1238–39 (11th Cir.1983) (per curiam).

Williams' fourth claim is that the trial court improperly admitted two statements: one made the day after the murder and the second made while he was accompanied by his attorney. During the first meeting, Williams claims he was not given his *Miranda* warnings and that he was questioned after he requested an attorney. During the second meeting, he likewise claims that he was not informed of his rights and that he was induced into giving a statement because of an implied promise of leniency. After conducting a *Jackson v. Denno* hearing, the state trial court rejected these claims. This decision was subse-

quently affirmed by the Georgia Supreme Court on direct appeal. *Williams v. State,* 250 Ga. at 555–57, 300 S.E.2d at 304.

■ When reviewing questions involving the voluntariness of a confession in a habeas proceeding under 28 U.S.C. sec. 2254, we must make an independent determination of the voluntariness of a confession as an issue of law. *See Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985). Still,

> subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings, often require the resolution of conflicting testimony of police and defendant. The law is therefore clear that state court findings on such matters are conclusive on the habeas court if fairly supported in the record and if the other circumstances enumerated in sec. 2254(d) are inapplicable.

*Id.* 106 S.Ct. at 453. During the *Jackson v. Denno* hearing the state trial court determined that Williams had been given *Miranda* warnings prior to both statements. Also, the trial court determined that Williams understood these warnings and that no inducements or threats were made to cause Williams to make the statements. Furthermore, Williams was accompanied by his attorney when he gave the second statement. In light of these findings, we cannot reasonably conclude that Williams' statements were unfreely, unknowingly or involuntarily made. *See generally United States v. Sanders,* 639 F.2d 268, 270–71 (5th Cir.1981) (statement made by defendant after being advised of her rights was freely, knowingly and voluntarily made and not improperly admitted); *see also Chaney v. Wainwright,* 561 F.2d 1129, 1132 (5th Cir.1977) (statement made by defendant based upon misjudgment of the consequences of calculated risk do not deprive statement of its voluntary character). Thus, both statements were properly admitted.

■ Williams' fifth contention focuses on the prosecutor's closing argument during the sentencing hearing. In *Brooks v.*

*Kemp,* 762 F.2d 1383 (11th Cir.1985) (en banc), this court set forth the standard for reviewing prosecutorial arguments made during the sentencing phase of a capital trial. We held that improper statements will not warrant habeas relief under section 2254 unless the statements render the entire sentencing proceeding "fundamentally unfair." *Id.* at 1399–1400 (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)). When making this determination, we must ask whether there is a "reasonable probability" that, but for the prosecutor's offending remarks, the outcome of the sentencing hearing would have been different. *Id.* at 1401–02 (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). As *Strickland* instructs, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068. "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986).

 Under this standard of review, although we wholeheartedly condemn the prosecutor's remarks, we do not believe that these comments rendered Williams' sentencing proceeding fundamentally unfair. Clearly, the remarks were a gross mischaracterization of the Marine Corps' function and of the training its members receive. The idea that Marines, who have played such a vital role in protecting freedom and democracy and preserving peace, derive some perverse satisfaction in the taking of a human life—even that of an enemy—is not only patently wrong, but a gross insult to all members of this elite branch of our armed forces. Still, notwithstanding the offensive nature of the prosecutor's remarks, appellate courts must not issue writs of habeas corpus merely because a prosecutor's misguided remarks were "undesirable or even universally con-

demned." *Id.* (citing *Darden v. Wainwright,* 699 F.2d 1031, 1036 (11th Cir. 1983)). We agree with the observation of the Georgia Supreme Court that "[t]he district attorney's argument is an obvious overstatement and its factual incorrectness is readily apparent to anyone." *Williams v. State,* 250 Ga. at 563, 300 S.E.2d at 308. This observation seems to have been shared by Williams' attorney who responded during his closing argument to the jury that, "[y]ou and I both know that that's the farthest thing from the truth there is." Also, that no objection was made during the prosecutor's closing argument further supports our belief that the statement was not severe enough to render the sentencing hearing fundamentally unfair. *See Brooks,* 762 F.2d at 1397 n. 19 ("the lack of an objection is a factor to be considered in examining the impact of a prosecutor's closing argument."). Consequently, we deny Williams any relief on this basis.

In his sixth claim, Williams claims a *Sandstrom* error and contends that the trial court's burden shifting instructions to the jury on the presumption of intended consequences was not susceptible to the harmless error analysis of *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). The Georgia Supreme Court, on remand from the United States Supreme Court for reconsideration in light of *Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), concluded that the trial court's jury charge violated *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).[7] *See Williams v. Kemp,* 255 Ga. 380, 338 S.E.2d 669 (1986). The state court further concluded that the *Sandstrom* error was harmless beyond a reasonable doubt. *Id.* at 388–89, 338 S.E.2d at 675–76.

 We also conclude that under *Rose v. Clark,* any error was harmless beyond a reasonable doubt. "This Circuit recognizes harmless error in two situations: (1) where the erroneous instruction was applied to an

---

7. Williams' jury was instructed as follows, "A person of sound mind and discretion is presumed to intend the natural and probable con-

sequences of his acts, but the presumption may be rebutted, ..."

element of the crime that was not at issue in the trial, or (2) where the evidence of the defendant's guilt was overwhelming." *Dick v. Kemp,* 833 F.2d 1448, 1451 (11th Cir.1987) (quoting *Dix v. Kemp,* 832 F.2d 546 (11th Cir.1987) (en banc)); *see also Davis v. Kemp,* 752 F.2d 1515, 1521 (11th Cir.) (en banc) (pre-*Rose* case), *cert. denied,* 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985).

In the instant case, the trial court's instruction was harmless beyond a reasonable doubt because the evidence of Williams' guilt was overwhelming. In reaching this conclusion, we are mindful that the proper focus of our inquiry is "whether the evidence of *intent,* rather than the more inclusive issue of *guilt,* is overwhelming." *Brooks,* 762 F.2d at 1390 (emphasis in original); *see also Davis,* 752 F.2d at 1521 n. 10 ("the crucial inquiry relates to whether or not there is overwhelming evidence of intent"). "Thus, in many cases, a *Sandstrom* error as to intent can be found harmless where evidence of intent is overwhelming, even where there is conflicting evidence as to whether the defendant was the killer." *Drake v. Kemp,* 762 F.2d 1449, 1454 (11th Cir.1985) (en banc) (citing *Brooks* and *Davis*), *cert. denied,* —— U.S. ——, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986).

The uncontradicted evidence in this case indicates that the victim died as a result of ten crushing blows to the skull with a blunt object and smoke inhalation from a fire that was intentionally ignited. Testimony was introduced to the effect that blood was splattered over the floor and the walls of the hallway where Lane's body was found. In addition, photographs were put into evidence corroborating this testimony. This evidence overwhelmingly indicates that whoever killed Lane intended to do so. *See Tucker v. Kemp,* 762 F.2d 1496 (11th Cir. 1985) (en banc) (evidence of crushing, fatal blow to victim's skull with metal pole negated possibility that killing was accidental or otherwise unintentional, therefore, *Sandstrom* error was harmless); *see also Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982) (*Sandstrom* error harmless where evidence indicated defendant intend-

ed to kill victim by stabbing him eleven times with an ice pick).

▮ Williams' seventh contention is that the jury instructions given during the sentencing phase of his trial failed to apprise the jury of the nature and function of mitigating circumstances. When considering appeals of this nature, the standard of review is whether "any reasonable juror could have failed to understand the challenged instructions and the role of mitigation." *Peek v. Kemp,* 784 F.2d 1479, 1486 (11th Cir.1986) (en banc); *High v. Kemp,* 819 F.2d 988, 991 (11th Cir.1987). As *Peek* instructs, this analysis requires that the jury instructions be viewed in the context of the entire sentencing proceeding. *Peek,* 784 F.2d at 1486, 1489–90 (citing *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)). Moreover, the challenged instructions need not "include any particular words or phrases to define the concept of mitigation or of the function of mitigating circumstances." *Id.* at 1494.

With these guiding principles in mind, we have little difficulty concluding that the trial court's instructions sufficiently informed the jury as to the nature and function of mitigating circumstances. The trial court instructed the jurors that "you should consider all of the evidence submitted in the trial of this case in arriving at your verdict as to the sentences imposed. This would include any evidence of mitigating circumstances received by you in this case." Later, the jurors were told that the sentence to be imposed "was entirely within your discretion, and you may provide a life sentence *for any reason that is satisfactory to you, or without any reason,* if you care to do so." (emphasis added). The jurors' broad discretion was underscored when at the close of its instructions, the trial court reemphasized that "it's entirely within your discretion, *for any reason or for no reason whatsoever,* to return a verdict of life imprisonment as to punishment." (emphasis added). By informing the jurors of their wide discretion to recommend against death, these instructions provided the jury with a clear basis to focus

upon and consider evidence of mitigating circumstances.

Also, although the trial court's instructions themselves did not focus on particular mitigating circumstances, the fact that the prosecution presented no additional evidence during the sentencing hearing while four defense witnesses testified on Williams' behalf "cast[s] an explanatory light" on the nature and function of mitigating circumstances. *See Peek*, 784 F.2d at 1492 n. 13. Williams' attorney presented the testimony of Williams' mother and three ministers who testified as to Williams' good character. Other evidence relating to his support of his grandparents and service as a Marine was presented as well. The mitigating quality of this evidence was self-evident. As such, no reasonable juror could have failed to understand that the only evidence produced at the sentencing hearing was mitigating evidence and that this evidence could provide a basis for not imposing the death penalty.

An additional indication that all parties present at the proceedings perceived that the instructions did in fact convey to the jury the significance of mitigating circumstances is evidenced by the fact that, at the close of the sentencing instructions, no objections or exceptions were made. *Peek*, 784 F.2d at 1493 (citing *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) ("It is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.")). Under these circumstances, Williams' objection to the trial court's instructions on mitigating evidence is without merit.

■ Williams' eighth contention is that his death sentence was arbitrarily imposed because the prosecution sought the death penalty after Williams voluntarily withdrew his plea agreement in which he would have received thirty years for manslaughter. Also, he challenges the constitutionali-

ty of one of the statutory aggravating factors found by the jury.

We are unpersuaded by Williams' argument, that since a prison sentence was satisfactory to the prosecution before trial, it should have been satisfactory to the prosecution after trial. The record clearly indicates that Williams withdrew his plea agreement even though he was advised against doing so. By withdrawing his plea, Williams and the state were returned to the position they occupied prior to the execution of the plea bargain when Williams stood charged with the murder of Archie Lane and burglary. *Cf. Ricketts v. Adamson*, — U.S. —, 107 S.Ct. 2680, 2686, 97 L.Ed.2d 1 (1987) (prosecution for first degree murder after defendant breaches plea agreement does not violate double jeopardy principles, "[t]he Double Jeopardy Clause ... does not relieve a defendant from the consequences of his voluntary choices"). Accordingly, the state was free to proceed with its prosecution and to pursue the death sentence.

■ We are similarly unpersuaded by Williams' argument that one of the two aggravating circumstances found by the jury in support of his sentence was constitutionally insufficient. Specifically, Williams challenges O.C.G.A. sec. 17–10–30(b)(7), which allows imposition of the death penalty for the crime of murder where the offense "was outrageously or wantonly vile, horrible and inhuman in that it involved torture, depravity of mind, or aggravated battery to the victim." [8] This claim is pretermitted by *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), in which the United States Supreme Court upheld a death sentence where one of the two aggravating circumstances supporting the jury's verdict was subsequently ruled unconstitutional by the Georgia Supreme Court. The United States Supreme Court, in *Zant*, based its decision on the fact that the jury expressly found aggravating circumstances that were valid and legally sufficient to support a death sen-

---

8. In addition to O.C.G.A. sec. 17–10–30(b)(7), Williams' sentencing jury expressly found that the "murder was committed while the offender was engaged in the commission of burglary...." O.C.G.A. sec. 17–10–30(b)(3).

**1286**

tence. *Id.* 103 S.Ct. at 2745. Because Williams challenges only one of the two aggravating circumstances found by the jury, even if we were to conclude that his claim was valid, the *Zant* decision dictates that his sentence is still constitutionally valid.

▉ In his ninth issue on appeal, Williams contends that his death sentence is a result of an unconstitutional pattern and practice of discrimination against poor white males accused of killing white victims. Williams' bald, conclusory assertions of discrimination merit no habeas relief. In addition, a much better supported argument concerning black defendants accused of killing white victims was recently rejected in *McCleskey v. Kemp,* —— U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

▉ Williams' final contention is that the Georgia capital sentencing statute is unconstitutional because it lacks any theoretical justification. As noted, however, by the Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976),

> we cannot say that the judgment of the Georgia Legislature that capital punishment may be necessary in some cases is clearly wrong. Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment of murder is not without justification and thus is not unconstitutionally severe.

*Id.* at 187–88, 96 S.Ct. at 2931. Such considerations require a similar conclusion in Williams' case today.

For the foregoing reasons, the judgment of the district court denying Williams' petition for a writ of habeas corpus is AFFIRMED.